IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANE DOE,

        Plaintiff,

v.                                            Case No.  23-2548-JWB-TJJ

LYFT, INC. et al,

        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant Lyft, Inc.'s ("Lyft") motion to dismiss for failure to state a claim.  (Doc. 11.)  The motion is fully briefed and ripe for decision.  (Doc. 12, 21, 23.)  The motion is GRANTED IN PART and DENIED IN PART for the reasons stated herein.

**I.      Facts**

The facts are taken from Plaintiff's First Amended Petition and are assumed to be true for purposes of deciding the motion to dismiss.  Plaintiff alleges that on February 1, 2022, Lyft received a driver application from an individual identified as "Terri Parham."  (Doc. 1-4 at 10). Although the picture of the Missouri driver's license included with the application was a valid state license for an individual named Terri Parham, the driver photo submitted with the application was for Defendant Michalia Williams, who had a previous criminal record and did not possess a valid driver's license. (*Id.* at 11).  This means that the picture on the driver's license submitted for approval and the picture of the driver on the Lyft account did not match.  (*Id.*)  The vehicle, insurance, and contact information for this application were all in the name of Defendant Joshua Williams, another convicted felon. (*Id.*).

On March 5, 2022, Plaintiff, who is proceeding under the pseudonym Jane Doe in this case, used the Lyft app to call for a ride to a liquor store. (*Id.*, at 12). Defendant Lyft assigned Jane Doe to a driver who was using the allegedly fraudulent "Terri" account. (*Id.*) When "Terri" arrived to pick up Plaintiff, Ms. Doe recognized that the driver of the vehicle matched the picture on the Lyft account, who was Ms. Williams. When Plaintiff entered the vehicle, there were two people in the car, Michalia Williams and Joshua Williams. (*Id.*) After driving Plaintiff to her destination and back to her apartment, Michalia and Joshua entered her apartment at the conclusion of the ride and raped her while she was intoxicated and unconscious. (*Id.* at 13.) The two assailants then left with several of Plaintiff's personal belongings. (*Id.*)

The next morning, Plaintiff sought medical attention from a hospital in Lawrence, Kansas. The Lawrence Police Department took over the investigation and apprehended Michalia and Joshua, charging them with aggravated criminal sodomy and theft. (Doc. 1-4 at 14.) Defendant Joshua Williams pled guilty to felony aggravated battery and was sentenced to 32 months in prison. Defendant Michalia Williams pled guilty to two counts of felony theft. (*Id.*)

Plaintiff filed her initial petition against Lyft, Inc., Joshua M. Williams, Michalia D. Williams, and Terri Parham on September 29, 2023, in Kansas state court, along with a motion for leave to proceed pseudonymously. (Doc. 1-2, 1-3). In this petition, Plaintiff alleges seven counts related to Defendant Lyft, including negligence, product liability, vicarious liability, fraud, violation of the Kansas Consumer Protection Act, and negligence per se. Plaintiff then filed a First Amended Petition ("FAP") on October 31, 2023. (Doc. 1 at 2). Defendant Lyft timely filed for

removal on December 11, 2023, after being served on November 20.  (Doc. 1.)  Lyft now moves

to dismiss Plaintiff's first amended petition in part.[1]  (Doc. 12.)

## II.    Standard

In order to withstand a motion to dismiss for failure to state a claim under Federal Rule of

Civil Procedure 12(b)(6), a complaint must contain enough allegations of fact to state a claim to

relief that is plausible on its face.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the

light most favorable to Plaintiff.  *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008).

Conclusory allegations, however, have no bearing upon the court's consideration.  *Shero v. City

of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).  Rule 12(b)(6) "does not require that

Plaintiff establish a prima facie case in [its] complaint, but rather requires only that the Plaintiff

allege enough factual allegations in the complaint to set forth a plausible claim."  *Pueblo of Jemez

v. United States*, 790 F.3d 1143, 1171–72 (10th Cir. 2015) (internal citations omitted).  In the end,

the issue is not whether Plaintiff will ultimately prevail, but whether Plaintiff is entitled to offer

evidence to support her claims. *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005).

## III.    Analysis

Defendant Lyft moves to dismiss Counts II-VII of the FAP under various legal theories.

The court will address each in turn.

---

[1] At the time of removal, service of the summons and FAP had not yet been effectuated on Defendants Joshua M.
Williams, Michalia D. Williams, or Terri Parham.  (Doc. 1 at 2.)  Plaintiff later executed personal service on Defendant
Joshua Williams on April 4, 2025, but this Defendant has yet to make an appearance.  (Doc. 22.)

**A)  Product Liability (Count II).**

The Kansas Product Liability Act ("KPLA") governs all product liability claims in Kansas. K.S.A. § 60–3301 *et seq*.; *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741, 861 P.2d 1299 (1993).  Additionally, varying theories of product liability must be merged into one "product liability claim." *Id.* at 1311; K.S.A. § 60-3302(c).  "Under Kansas law, a product may be defective as to its manufacture, its design, or in the instructions or warnings that accompany the product." *Myrick v. Husqvarna Pro. Prod., Inc.*, 508 F. Supp. 3d 846, 864 (D. Kan. 2020) (citing *Delaney v. Deere & Co.*, 999 P.2d 930, 936 (2000)).  "To establish a prima facie case based on negligence or strict liability in a products liability case, plaintiff must produce evidence to establish three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left defendant's control." *Id.* (quoting *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1227 (D. Kan. 2002)).  "Regardless of the theory upon which recovery is sought, 'a plaintiff must prove that a defect in the product caused his injury.'"  *Id.* (citing *Wurm v. Ford Motor Co.*, No. 18-CV-2322-HLT, 2020 WL 1547852, *10 (D. Kan. 2020)).

As a threshold issue, the court must determine if product liability is appropriate in this case since the parties disagree on whether Lyft offers a ride-matching service or a product through their app.  Defendant argues that the various sections of the Kansas Transportation Network Company Services Act ("KTNCSA") describe the rideshare market as a service, (Doc. 12 at 7), while Plaintiff contends that the Lyft app (and resulting rides) is a tangible product based both on its use in the market and on the fact that Defendant was the designer, provider, and the sole distributor of the Lyft application.  (Doc. 21 at 5-6.)  However, neither approach seems to adequately describe the proper legal framework.  As the Northern District of California stated when evaluating product

4

liability claims like the ones here, "the parties proceed with an 'all or nothing' approach . . . [t]hese approaches are overly simplistic and misguided." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 838 (N.D. Cal. 2023). Both parties point to a variety of state trial court decisions which are divided on the issue of whether rideshare apps that match riders with drivers constitute a product or a service.[2] This divide in state courts highlights the fact that the "applicability of products liability torts to the digital world" presents "novel questions of law." *Id.*

Although historically courts have been hesitant to apply product liability principles to websites and other software products that provide matching services to users (such as social media and dating websites), there is a recent trend of expanding product liability theories towards these platforms. *See generally* John G. Browning, *A Product by Any Other Name? The Evolving Trend of Product Liability Exposure for Technology Platforms*, 16 ELON L. REV. 181 (2024). *Compare Crouch v. Ruby Corp.*, 639 F. Supp. 3d 1065, 1081 (S.D. Cal. 2022) ("Although Defendants do not sell products on their website, they sell a service . . . that subscribers pay for by purchasing credits to communicate with the matches Defendants provide . . . . [Defendant] is in the service of matchmaking, to 'find prospective matches for each subscriber.'"), *with T.V. v. Grindr, LLC*, No. 3:22-CV-864-MMH-PDB, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024) ([Defendant]

---

[2] In opposition to the motion to dismiss, Plaintiff characterizes Florida's Fifteenth Judicial Circuit Court decision of *Brookes v. Lyft, Inc.*, No. 50-2019-CA-004782, 2022 WL 19799628 (Fla. 15th Cir. Ct. Sept. 30, 2022), as a decision by a "Florida intermediate appellate court." (Doc. 21 at 4.) However, circuit courts in Florida are not intermediate courts of appeal; rather, they are trial courts. *See* "Florida Courts," https://www.flcourts.gov/Florida-Courts. In fact, there are no courts of intermediate appeal under the Florida Constitution, because Article V, Fla. Const., establishes District Courts as courts of final appeal under state law and the Florida Supreme Court is constitutionally a court of limited jurisdiction. *Ansin v. Thurston*, 101 So. 2d 808, 810 (Fla. 1958) ("It was never intended that the district courts of appeal should be intermediate courts . . . The intent of the Florida Constitution is to limit the Supreme Court's review of district court decisions."); *but cf. Bunkley v. State*, 882 So. 2d 890, 925 (Fla. 2004) (Pariente, J., dissenting) (arguing that Florida district courts are a type of "mid-level" or "intermediate" court of appeal). This misnomer of Florida's state judicial structure was also mis-stated by the Northern District of California in the multi-district litigation case *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 846 (N.D. Cal. 2023).

offers the Grindr app as a service but also [Defendant] designed and distributed the Grindr app, making Grindr's role different from a mere service provider, putting Grindr in the best position to control the risk of harm associated with the Grindr app, and rendering Grindr responsible for any harm caused by its design choices in the same way designers of physically defective products are responsible."). Given that the rideshare systems seem to have characteristics of both a product and a service, neither party's argument construing it exclusively as a product or a service is persuasive here.

The most persuasive precedent on this issue comes from the multi-district litigation decision regarding sexual assaults on the Uber platform. *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. MDL 3084 CRB, 2024 WL 4211217, at *24 (N.D. Cal. Aug. 15, 2024). Although finding that the Uber app was not a tangible product under the Restatement, Judge Breyer of the Northern District of California ruled that the design and distribution of the Uber app was "sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules of strict liability." *Id.* at *22 (internal citation omitted). Although the dicta from the Ninth Circuit used by Judge Breyer stating that malfunctioning software can be a basis for product liability does not have the same force in this District as it does in the Northern District of California, it is still persuasive. *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991). Moreover, it seems to accord with similar dicta from the Kansas Court of Appeals holding that a malfunctioning SDMI Generic System software is a good that is subject to the Uniform Commercial Code. *Sys. Design & Mgmt. Info., Inc. v. Kansas City Post Off. Emps. Credit Union*, 14 Kan.App.2d 266, 788 P.2d 878, 881–82 (1990).

Accordingly, the court concludes that the facts as pled in this case are sufficient to establish that the Lyft app is a software or algorithmic product with sufficient similarities to a tangible

product to subject it to product liability law.  That conclusion reflects the realities of Lyft's business model as alleged in the complaint: Lyft offers a ride-sharing service, but it provides its own proprietary product – the Lyft application – that its drivers and passengers are required to use in order to provide or receive the service that Lyft is selling.  *See* K.S.A.§ 8-2702(f)(2) (stating drivers "use[] a personal vehicle to provide services for riders matched through a digital network controlled by a transportation network company").  However, this does not mean that every injury alleged by the Plaintiff in this Count is automatically traceable to Lyft via the app under a theory of product liability.  Rather, Plaintiff must show how an alleged flaw in the app software led to a specific injury. As Judge Breyer persuasively states in the Uber multi-district litigation case:

> "the Court has established that the Uber app is a product, and Uber could be liable for defects in the app. But it does not follow from these conclusions that strict liability applies to everything that might go wrong in relation to the use of the app. A more difficult question arises: Are the alleged "defects" really defects in the Uber app, or are they just problems with Uber's services (or with some other aspect of its business model)?"

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 2024 WL 4211217, at *24.

As such, Plaintiff must show that her alleged injury resulted from the app itself, whether in the design or in the functionality of the app.  "This distinction, though sometimes fine, is important to maintain. Without it, there would be nothing to prevent Plaintiffs' negligence claims from being entirely swallowed up into their strict liability claims."  *Id*.  A key determination is causation; would the alternative app design have prevented the assault from occurring.  In the FAP, there appear to be things that Plaintiff has reasonably pled that could potentially meet this causation requirement, such as screening measures to confirm a driver's identity (FAP ¶ 67(a)) or the failure of the app to identify that the biometric information of the two photos on the Lyft driver application were not the same (FAP ¶ 20).  *See generally In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 2024 WL 4211217, at *25 (laying out potential causation situations from the Master

Complaint that needed to be pled with more particularity to justify a theory of strict product liability).

Interpreting the facts pled in a light most favorable to Plaintiff, Plaintiff has pled sufficient allegations of fact to survive the threshold of a motion to dismiss with regard to product liability for the design and use of the Lyft app, such as the fact that the app did not properly distinguish between the actual driver's photo and the photograph on the driver's license. As a result, Defendant's motion to dismiss for failure to state a claim is denied as to Count II at this stage of the proceedings.

**B) Lyft's Vicarious Liability (Counts III-IV).**

Plaintiff brings tort claims against Lyft under a theory of vicarious liability. Plaintiff alleges that Lyft is vicariously liable for both the negligent acts of Terri Parham in allowing her name and identity to be used to create a fraudulent Lyft driver account (Count IV) and the assault and battery by Michalia Williams and Joshua Williams (Count III). A principal's vicarious liability for his agent's conduct arises under the doctrine of respondeat superior. *Brown v. Wichita State University*, 217 Kan. 279, 287, 540 P.2d 66, 75 (1975), *vacated in part on reh'g on other grounds*, 219 Kan. 2, 547 P.2d 1015 (1976); *Hughes v. Jones*, 206 Kan. 82, 476 P.2d 588, 592 (1970). Under Kansas law, a principal's liability for his agent's negligence is determined by asking whether, at the time in question, the agent was engaged in the furtherance of the principal's business to such a degree that the principal had the right to direct and control the agent's activities. *Brinkley v. Farmers Elevator Mutual Insurance Co.*, 485 F.2d 1283, 1286 (10th Cir.1973); *Brown*, 540 P.2d at 75; *Hughes*, 476 P.2d at 592. The primary factor to be considered is the control which the principal had over the agent. *Brown*, 540 P.2d at 75; *Hughes*, 476 P.2d at 592. *See also Gomez*

*v. Hug*, 7 Kan.App.2d 603, 645 P.2d 916, 924 (1982) (noting that "[t]he key element for the application of respondeat superior is the principal's or master's right to direct and control the activities of the agent or servant").  Lyft moves to dismiss these claims on the basis that Plaintiff's complaint fails to sufficiently allege that Lyft is vicariously liable for the acts of its co-Defendants.

### 1)  Vicarious liability for Negligence

In this matter the FAP is devoid of allegations that would show Terri Parham was an agent of Lyft.  Plaintiff alleges that "LYFT is vicariously liable for Parham's conduct because she was in the course and scope of her agency at the time of the negligent acts."  (FAP ¶ 82.)  However, this is merely a conclusory allegation.  A review of the FAP shows that it contains no factual allegations regarding any actions taken by Terri Parham whatsoever.  Paragraph 6 of the FAP addresses Parham's citizenship and residency.  While Parham is mentioned in other places throughout the FAP, none of those instances makes any allegations about anything Parham did or failed to do.  The closest Plaintiff comes to anything meaningful is in Paragraph 80 of the FAP, where she asserts that Parham breached her duty of care by "[f]ailing to prevent Joshua Williams and Michalia Williams from using her driver's license to open a LYFT account; [and e]ntrusting Joshua Williams and Michalia Williams to operate her motor vehicle."  However, the FAP contains no allegations about anyone using Parham's driver's license or Parham entrusting her car to anyone.  On the contrary, the FAP is devoid of any such allegations.  Accordingly, all the allegations against Parham are completely conclusory and inadequate to state a claim against her.  Moreover, since Lyft's liability under Count IV derives from Parham's liability, (FAP ¶ 82), the FAP fails to state a claim against Lyft under Count IV.

### 2)  Vicarious liability for the Assault and Battery by Michalia and Joshua Williams

Defendant contends that it is not responsible for the tortious actions of agents that are not in furtherance of the employer's business.  (Doc. 12 at 18-19.)  Plaintiff contends that Michalia and Joshua Williams were the apparent agents of Lyft, and that her assault came while Michalia and Joshua Williams were in the course and scope of their employment by Lyft.[3]  (FAP ¶¶ 70, 76.)  In Kansas, "[t]he rule to be deduced . . . appears to be that if an assault by an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business, it will be considered personal to the employee and not such as will make the employer answerable." *Williams v. Cmty. Drive-In Theater, Inc.*, 214 Kan. 359, 366, 520 P.2d 1296, 1301–02 (1974).  However, "[i]f the assault is committed by the employee while furthering the employer's interest in some way the employer is liable under the doctrine of respondeat superior-Let the master answer.  Thus, we see the relation of the act to the employer's business becomes an important criterion in determining the employer's liability."  *Id.* at 1302.  As a result, Kansas recognizes the general rule that "a master is not liable for a tortious act committed by his servant, including an assault and battery upon a third person, unless the act be done by authority of the master, either express or implied, or unless the act be done by the servant in the course or within the scope of his employment."  *Beggerly v. Walker*, 194 Kan. 61, 64, 397 P.2d 395, 399 (1964).

The question of whether an employee is acting within the scope of his employment is generally a question left to the jury, unless "only one reasonable conclusion can be drawn from the evidence," in which case the court can decide the issue as a matter of law.  *Wayman v. Accor*

---

[3] The court will assume the existence of the alleged agency relationship for the purposes of the present motion given that it was pled in the FAP (FAP ¶¶ 75-77) and Defendant does not challenge this aspect of Plaintiff's claim in the present motion (and has instead opted to argue it at a later germane point). (Doc. 12 at 18, n.6.)

*N. Am., Inc.*, 45 Kan. App. 2d 526, 533, 251 P.3d 640, 646 (2011).  In this matter, the question is whether the assault of Plaintiff by Michalia and Joshua Williams is within the scope of employment.  Sexual assault by employees is generally outside of the conduct authorized by an employer.  *Est. of Glaves v. Mapleton Andover LLC*, 659 F. Supp. 3d 1208, 1223–25 (D. Kan. 2023) (granting summary judgment to defendant on the claim that an assisted living facility ratified the rape of one of their residents by an employee).  Additionally, if the assault occurred after Michalia and Joshua Williams had ended the Lyft ride, then the assault occurred even further outside the scope of employment because their "actual work for the company had ceased for the day."  *Kyle v. Postal Telegraph-Cable Co.*, 118 Kan. 300, 235 P. 116, 117 (1925).  In the *Kyle* decision, the Kansas Supreme Court held an employer was not liable for its messenger boy hitting a pedestrian with his bicycle on his way home.  While the boy had company reports in his possession, the employer did not exert any control over what he did on his way home.  The court reasoned that "carrying ... the report was merely incidental to his going home."  *Id.*  Because the boy was not within the scope of his employment after he left work, the company was not liable for the collision. *Id.*

Plaintiff has alleged that "during the course of the LYFT ride, Defendants made unwanted and unpermitted sexual physical contact with Plaintiff."  (FAP ¶ 72.)  The FAP additionally states that after completing the Lyft ride, the Williams "deactivated the LYFT App and entered Plaintiffs apartment at the conclusion of the ride" where they later "violently raped Plaintiff while she was intoxicated, unconscious and physically powerless."  (FAP ¶¶ 46, 48).  The second assault by Michalia and Joshua Williams occurred well after their employment activities for Lyft ended, similar to the situation in *Kyle*.  That leaves the question whether Lyft is vicariously liable for the first contacts that allegedly occurred during the drive.

11

Plaintiff relies on the doctrine of apparent authority based on the fact that she was sent Michalia Williams' picture on the Lyft app. However, this fact alone does not justify finding that Defendant, expressly or impliedly, authorized its employee to assault the Plaintiff. *Carter v. Walmart, Inc.*, No. 18-1335-EFM, 2019 WL 5424759, at *2 (D. Kan. Oct. 23, 2019). Additionally, a sexual assault is not furthering any employer's interest. *See Id*. The FAP does not adequately allege that Michalia Williams was within the scope of her employment and furthering Lyft's interests, if such employment relationship even exists, beyond merely making a conclusory allegation to that effect. This is even more relevant with regard to the actions of Joshua Williams, since there is no evidence in the FAP that Lyft represented any sort of relationship with Joshua to the Plaintiff. Therefore, Defendant's motion to dismiss is granted.

## C)  Fraud Claim against Lyft (Count V)

Plaintiff has alleged that Lyft fraudulently made false representations as to the screening of its drivers and falsely promised the safety of its rides. (Doc. 1-4 at 22.) Lyft moves to dismiss on the basis that Plaintiff has failed to allege fraud against it with particularity and that the fraud claim fails to state a claim. (Doc 12 at 21-28.) Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead fraud with particularity to give a defendant "adequate notice of the plaintiff's claim, to protect defendants from reputational damage caused by 'improvident charges of wrongdoing,' and to 'inhibit the institution of strike suits.'"[4] *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001) (quoting *Farlow v. Peat, Marwick,*

---

[4] A strike suit is a lawsuit "often based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement." *Strike Suit*, BLACK'S LAW DICTIONARY (12th ed. 2024). The U.S. Supreme Court has characterized strike suits as claims "by people who might be interested in getting quick dollars by making charges without regard to their truth so as to coerce corporate managers to settle worthless claims in order to get rid of them." *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966).

*Mitchell & Co.*, 956 F. 2d 982, 986 (10th Cir. 1992)). The plaintiff must "set forth the time, place and contents of [any] false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)). More succinctly, a plaintiff must establish the "'who, what, where, and when' of the alleged fraud." *Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1153 (D. Kan. 2006) (quoting *Plastic Packaging Corp.*, 136 F. Supp. 2d at 1203).

Construing the facts in the light most favorable to Plaintiff, this Court finds that Plaintiff has not cited distinct, independent conduct by Lyft to properly plead a fraud claim. Apart from the date of her ride and assault (FAP ¶ 39), she has not pled when or how Lyft made the alleged false misrepresentations and false promises. The allegations that Lyft "knew that its security screening was deficient, that its background checks were below industry standards and that its drivers were not trained or supervised, or given sexual harassment and abuse standards" (FAP ¶ 89) are fundamentally negligence claims rather than fraud claims.

For the foregoing reasons, the court finds Plaintiff's fraud claim does not meet Rule 9(b)'s particularity requirement. In Plaintiff's response to the motion she contends, "At a minimum, Plaintiff's Petition states a claim for negligent misrepresentation." (Doc. 21 at 11.) Whether or not Lyft knew of the likelihood that its driver would engage in tortious behavior or fraudulently submitted a Lyft driver application is something that can be properly evaluated under Plaintiff's negligence claim and does not support a fraud claim against Lyft. Therefore, Defendant's motion to dismiss Plaintiff's claim of fraud on the grounds of failure to plead with sufficient particularity is granted.

**D) Kansas Consumer Protection Act ("KCPA") (Count VI).**

Plaintiff brings a claim under the KCPA claiming that Lyft committed a variety of KCPA violations, including by making false or misleading representations as to the safety of its rides and the screening of its drivers (K.S.A. § 50-626) along with other unconscionable conduct (K.S.A. § 50-627). Defendant contends that Plaintiff has not pled all the elements of a KCPA claim at the heightened pleading level required. (Doc. 12 at 20-28.) Defendant also argues that Plaintiff has not pled any facts that show it engaged in deceptive or unconscionable conduct. (*Id.*) Plaintiff disagrees and reiterates facts she believes establishes a prima facie case for deceptive practices on March 5, 2022. (Doc. 21 at 12–13.)

With regard to deceptive practices claims under the KCPA, actual deception is not required. *Schneider v. Liberty Asset Mgmt.*, 45 Kan.App.2d 978, 251 P.3d 666, 671 (2011). To state a claim for deceptive practices under the KCPA, a plaintiff must demonstrate that a defendant's act adversely affected her legal rights and a causal connection exists between the deceptive act or practice and claimed injury. *Finstad v. Washburn University*, 252 Kan. 465, 845 P.2d 685, 688–89 (1993). *See also Moral v. PHH Mortg. Corp.*, No. 23-3123, 2024 WL 2992360, at *4 (10th Cir. June 14, 2024). Although Plaintiff alleges here that Lyft made false or misleading representations as to the safety of its rides and drivers, these allegations are conclusory. Plaintiff has not pled any facts that on their face would make a claim for deceptive practices plausible, nor has she pled any facts that show Lyft intentionally misled consumers or misstated its security procedures on the Lyft app. Thus, the allegations as pled are nothing more than conclusory statements.

The KCPA also protects consumers from unconscionable acts by suppliers. K.S.A. § 50-627. To state a prima facie case for an unconscionable act under the KCPA, Plaintiff must show:

14

(1) that she is a consumer; (2) that Defendant is a supplier; (3) that Defendant committed an unconscionable act or practice; and (4) Plaintiff was aggrieved. *In re Motor Fuel Temperature Sales Practices Litig.*, 867 F. Supp. 2d 1124, 1141 (D. Kan. 2012). The first two elements are not at issue.

Defendant contends that Plaintiff has not pled the third (and by extension, the fourth) element with the requisite particularity. Members of this court have reached different conclusions as to whether KCPA claims are subject to a heightened pleading standard. *Compare* Tomlinson v. Ocwen Loan Servicing, LLC, Case No. 15-1105-EFM-KGG, 2015 WL 7853957, at *2 (D. Kan. Dec. 3, 2015) ("KCPA claims need not be pleaded with particularity.") *with* Pinkney v. TBC Corp., Case No. 2:19-cv-02680-HLT, 2020 WL 1528544, at *6 (D. Kan. Mar. 31, 2020) ("After a careful review, the Court concludes that Plaintiff's allegations under the KCPA sound in fraud and, thus, are subject to Rule 9(b)'s heightened pleading standard and must be pleaded with particularity."). The undersigned need not decide this issue, though, because under any pleading standard, Plaintiff has failed to plausibly allege unconscionable conduct. Whether an act is unconscionable under the KCPA is a legal question for the court and subject to the discretion of the court reviewing the facts of a given case. *See, e.g.*, *State ex rel. Stovall v. ConfiMed.com*, 272 Kan. 1313, 1317, 38 P.3d 707 (2002); *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 249, 62 P.3d 653 (2003). To ultimately show an unconscionable act or practice, there must be "both supplier deception and unequal bargaining power" between the parties. *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 298 Kan. 503, 525, 314 P.3d 852, 867 (2013). *See also Tomlinson*, 2015 WL 7853957, at *2.

Here, Plaintiff has not plausibly alleged that Lyft knew that the photograph identifying Michaela Williams as a Lyft driver was false and matched Plaintiff with the driver regardless of its knowledge of falsity. (Doc. 1-4 at 23-24; Doc. 21 at 12–13.) The fact that the photo of Michaela

Williams later proved fraudulent does not show that Lyft had knowledge of the fraud or willfully gave false information to deceive Plaintiff. *See Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1179 (D. Kan. 1999). Plaintiff additionally alleges that Lyft engaged in "unconscionable acts in violation of K.S.A. 50-627," but offers no specific facts that would allow any inference in this matter, apart from mere conclusory statements. Because the court finds that Plaintiff has not properly alleged any facts that would show that Defendant engaged in any deceptive behavior, the court concludes that Plaintiff has not stated a prima facie case for false or misleading representations or unconscionable conduct in violation of the KCPA. Plaintiff's KCPA claim is accordingly dismissed.

**E) Negligence Per Se under the Kansas Transportation Network Company Services Act (the "KTNCSA") (Count VII).**

Plaintiff brings a negligence per se claim under the KTNCSA claiming that Lyft violated the requirements of the KTNCSA by not properly conducting a background check on their drivers (K.S.A. § 8-2712), improperly allowing a driver with a criminal history and without a driver's license (K.S.A. § 8-2720), and incorrectly sending the wrong picture of the driver to the Plaintiff rider (K.S.A. § 8-2706). Defendant contends that the KTNCSA does not create a private cause of action, and that Plaintiff has not pled that Lyft violated the KTNCSA here. (Doc. 12 at 28-31.)

The basic elements of negligence per se under Kansas law are: "(1) a violation of a statute, ordinance, or regulation, and (2) the violation must be the cause of the damages resulting therefrom." *Pullen v. West*, 278 Kan. 183, 92 P.3d 584, 593 (Kan. 2004) (citing *Cullip v. Domann*, 972 P.2d 776 (Kan. 1999)). Additionally, the plaintiff must establish that an individual right of action for injury arising out of the violation was intended by the legislature. *Id.* The determination

16

of whether an individual right of action exists under a statute is a question of law, which is determined using a two-part test: (1) "the party must show that the statute was designed to protect a specific group of people rather than to protect the general public," and (2) "the court must review legislative history to determine whether a private right of action was intended." *Id.* (citing *Nichols v. Kan. Political Action Comm.*, 11 P.3d 1134 (Kan. 2000)). While some statutes expressly impose personal liability, the absence of such language means that the legislative intent to grant or withhold such a right is determined primarily from the language of the statute as a whole. *LeTourneau v. Venture Corp.*, No. 15-CV-2629-JAR, 2017 WL 2378331, at *3 (D. Kan. June 1, 2017).

As a legal matter, negligence per se in Kansas is an inherently confusing proposition. According to the Kansas Supreme Court, "our courts have used the phrase inconsistently and with a variety of meanings. This confusion of meaning has led to a series of rules that are difficult to reconcile and equally difficult to apply." *Shirley v. Glass*, 297 Kan. 888, 894, 308 P.3d 1, 6 (2013). The Kansas Supreme Court of the early twentieth century recognized the rule that a breach of a duty imposed by law or ordinance is negligence per se, but also held that damages could be assessed against a defendant only if the violation was the proximate cause of the injury suffered or otherwise substantially contributed to the injury. *Williams v. Iola Elec. R. Co.*, 102 Kan. 268, 170 P. 397, 398 (1918) ("It is generally held that disobedience of a city speed ordinance is negligence per se; but to entitle one injured or damaged through the breach of the ordinance to recover judgment thereon he must himself be free from fault or negligence"); *Kendrick v. Atchison, T. & S. F. R. Co.*, 182 Kan. 249, 260, 320 P.2d 1061, 1070–71 (1958) ("In this jurisdiction we follow the rule that while the breach of duty imposed by law or ordinance is negligence per se, liability in damages cannot be predicated on its violation unless the breach of the law or ordinance is the

proximate cause of the injury or damages, or substantially contributes thereto."). This was especially true for cases arising from statutory speed and safety requirements for railroad operations. *See, e.g.*, *Atchison, T. & S.F.R. Co. v. Morgan*, 31 Kan. 77, 1 P. 298, 299 (1883); *Kansas City Suburban Belt Ry. Co. v. Herman*, 64 Kan. 546, 68 P. 46, 46, aff'd, 187 U.S. 63, 23 S. Ct. 24, 47 L. Ed. 76 (1902); *Cooper v. Chicago, R.I. & P. Ry. Co.*, 117 Kan. 703, 232 P. 1024 (1925), *disapproved of on other grounds by Smith v. Union Pac. R. Co.*, 222 Kan. 303, 564 P.2d 514 (1977); *Whitcomb v. Atchison, T. & S.F. Ry. Co.*, 128 Kan. 749, 280 P. 900, 901 (1929); *Griffith v. Atchison, T. & S.F. Ry. Co.*, 132 Kan. 282, 295 P. 687, 687 (1931). The general result of such negligence standards was to protect corporate defendants, usually railroads, from negligence suits seeking strict liability for the defendants failing to comply with statutory and regulatory safety requirements.

As the Kansas Supreme Court moved into the late twentieth century, they retained their opinions that negligence per se should not give rise to strict liability, but rather "proof of [per se] negligence is only one half of the equation leading to legal liability; proof of proximate cause is the other half." *Noland v. Sears, Roebuck & Co.*, 207 Kan. 72, 75, 483 P.2d 1029, 1032 (1971). Nevertheless, in the 1980's the Kansas Supreme Court began to modify its standard for negligence per se, holding that "the test of whether one injured by the violation of a statute may recover damages from the wrongdoer is whether the legislature intended to give such a right." *Greenlee v. Bd. of Cnty. Comm'rs of Clay Cnty.*, 241 Kan. 802, 804, 740 P.2d 606, 607–08 (1987); *see also Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980). This reached an apex in 1991 when the Court strongly proclaimed, "violation of a statute alone does not establish negligence per se. The plaintiff must also establish that an individual right of action for injury arising out of the violation was intended by the legislature. Statutes enacted to protect the public,

therefore, do not create a duty to individuals injured as a result of a statutory violation." *Kansas State Bank & Tr. Co. v. Specialized Transp. Servs.*, Inc., 249 Kan. 348, 370-71, 819 P.2d 587, 603 (1991); *see also Schlobohm v. United Parcel Serv., Inc.*, 248 Kan. 122, 125, 804 P.2d 978, 981 (1991), *as corrected* (June 13, 1991) ("Violation of a statute or ordinance alone does not establish negligence per se . . . Statutes or ordinances enacted to protect the public at large, therefore, do not create a duty to individuals injured as a result of the statutory violation and the doctrine of negligence per se is inapplicable").

This rule has largely remained intact today, *see, e.g.*, *Pullen v. West*, 278 Kan. 183, 92 P.3d 584 (2004), leading some to say that "[i]n Kansas, the doctrine of negligence per se appears to differ from the negligence per se doctrine recognized in every other state." *Survey of Kansas Tort Law: Part I*, 49 U. Kan. L. Rev. 1037, 1053 (2001).  Nevertheless, Kansas law on this topic remains in flux, as demonstrated in the 2013 decision of *Shirley v. Glass*. 297 Kan. 888, 308 P.3d 1 (2013).  Although not evaluating the claims by plaintiffs in a negligence per se context due to the Plaintiff not properly preserving the claim, the Kansas Supreme Court seemed to soften its stance on general laws providing a means to show duty in a negligence case.  *Shirley*, 297 Kan. at 896, 308 P.3d at 7.

> "[T]he fact that a statute is intended to protect the safety of a broad category of citizens, such as potential victims of violent felons, does not preclude application of the statute to establish a duty of care in a tort proceeding. The injury resulting from an action that violates a statute must only be of the character that the legislature intended to protect the public against." *Id*.

Perhaps in *Shirley* the Kansas Supreme Court may have begun to signal its movement towards a traditional view of per se negligence; however, at this time, we are still bound by the fact that that the Kansas Supreme Court has not changed its view that negligence per se still requires proof of legislative intent to create a private cause of action in a statute.

Moving to the facts of this matter, the issue of whether the KTMCSA creates an individual right of action appears to be a case of first impression before the court. The KTNCSA was enacted by the legislature in 2015. *See* Laws 2015, ch. 43, § 19, eff. May 14, 2015; Laws 2015, ch. 69, § 4, eff. July 1, 2015. *See also* K.S.A. § 8–2701 *et seq*. The text of the KTNCSA does not explicitly provide a private cause of action, but the fact that the statute lacks such language is not necessarily determinative. The threshold question the court must answer is whether there is a class of individuals the statute is supposed to protect rather than the general public. This court holds that much like the fire codes at issue in *Pullen v. West*, the KTNCSE is designed to protect the public rather than a specific group of people. *Pullen*, 92 P.3d at 593-95. This construction is supported by Plaintiff's own allegations, which assert that "[t]he KTNCSA is designed to protect Plaintiff and members of the public generally from violent criminals and sexual predators acting as drivers on a [Transportation Network Company's] rideshare app." (FAP ¶ 107.) Accordingly, both the nature of the statute and the Plaintiff's construction thereof supports the conclusion that the KTNCSA is meant to protect the general public.

Plaintiff argues that the Kansas Supreme Court decision in *Shirley v. Glass* holds that a statute designed to protect the general public can still be used in a tort proceeding such as this one. *Shirley*, 297 Kan. at 894, 308 P.3d at 6. However, the *Shirley* decision explicitly limited its holding to cases in which statutes are used in negligence actions to establish duty and breach rather than modifying the Kansas negligence per se standard. *Id.* ("Because Shirley asserted only a claim of simple negligence . . . we do not have to address at this time what a party must prove in order to state a claim that is created by statute. We instead are limited to considering what role the alleged statutory violations may play in a simple negligence action"). At the very least, *Shirley* authorizes plaintiff's reliance on the KTNCSA to establish the duty of care and a breach of that duty though

an alleged violation of the KTNCSA in their negligence count.  *See id.* at 7.  However, to the extent

that plaintiff is attempting to plead negligence per se as a separate "statutorily created private cause

of action," Kansas law precludes that approach.  *Id.* at 5.  As a result, Defendant's motion to dismiss

the negligence per se count is granted.  Nevertheless, the court leaves for another day the decision

whether certain requirements under the KTNCSA may be used by Plaintiff to help establish the

elements of duty and breach under its ordinary negligence claim, which Defendant did not

challenge in its motion to dismiss.


## IV.    Conclusion

Defendant's motion to dismiss (Doc. 12) is GRANTED IN PART and DENIED IN PART.

The motion to dismiss is granted as to Counts V-VII, and granted as to Lyft's vicarious liability

under Counts III-IV.  The motion is otherwise denied.

IT IS SO ORDERED.  Dated this 1st day of November, 2024.

  s/ John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
